IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

CYRENA KAY REYNOLDS,

     Plaintiff,

v.                              CIVIL ACTION NO. 2:08-0871

CONSOL OF KENTUCKY, INC.,

     Defendant.

## MEMORANDUM OPINION

Pending before the court is defendant's motion for summary judgment.  (Doc. # 55).  Plaintiff has filed a response in opposition to defendant's motion and the motion is ripe for the court's review.  For reasons expressed more fully below, defendant's motion is GRANTED.

## Background

The basis of this deliberate intent action is a job-related fatality which occurred on September 3, 2007, at the Bronzite Mine in Mingo County, West Virginia.  On that day, Brent Reynolds was employed by Consol of Kentucky, Inc. ("Consol") as a continuous miner operator.  Reynolds was killed when a portion of the roof on the underground mine collapsed on him.

Consol began mining operations in the Bronzite Mine in August 2006.  See Report of West Virginia Office of Miners' Health, Safety and Training at p.4 (hereinafter "WVOMHST Report at ___") (attached as Exhibit 1 to Defendant's Motion for Summary

Judgment).  In accordance with its roof control plan, the roof of the Bronzite Mine was secured by steel resin bolts that were four feet in length, with ten-foot cable bolts used in all intersections and elsewhere as needed.  Deposition of Kevin Williams, June 10, 2009, at 9 (Exhibit 3 to Defendant's Motion and Exhibit H to Plaintiff's Memo); Deposition of Ronald Yates, June 8, 2009, at 27-8 (Exhibit 2 to Defendant's Motion and Exhibit E to Plaintiff's Memo); see also Roof Control Plan dated July 2, 2006 (Exhibit J to Plaintiff's Response).

Approximately a month before the accident at issue herein, Brett Holbrook, assistant mine superintendent at the Bronzite Mine, gave instructions to begin preparing the No. 4 panel for mining.  Deposition of Brett Holbrook, June 8, 2009, at 21-22 (Exhibit 4 to Defendant's Motion and Exhibit D to Plaintiff's Memo).  The "rehabilitation" of the No. 4 Panel included the installation of roof bolts and clean up work.  Id. at 20-23; Deposition of Clell Scarberry, July 15, 2009, at 7-9 (Exhibit 5 to Defendant's Motion and Exhibit G to Plaintiff's Memo).  In order to determine whether the roof bolts were adequately supporting the mine roof, Consol had test holes drilled in various part of the No. 4 Panel.  Scarberry Depo. at 25.  One such test hole was drilled approximately six to ten feet from the spot where the roof later fell in on Reynolds.  Id. at 25-26.

September 3, 2007, was the first day of production on the No. 4 Panel.  Scarberry Depo. at 7; Holbrook Depo. at 11.  Late in his shift, the continuous miner operator on the day shift, Shawn Johnson, began mining the face of the No. 4 entry.  Deposition of Shawn Johnson, July 15, 2009, 13 (Exhibit 10 to Defendant's Motion and Exhibit P to Plaintiff's Memo).  Johnson cut 25 feet into the No. 4 entry before the end of his shift.  Id. at 13-14.

When Brent Reynolds arrived to begin his shift at 4:30 p.m. and take over for Johnson, he was informed that he had approximately 10 feet left to complete the No. 4 entry.  Id. at 14.  Prior to beginning work, Reynolds and his immediate supervisor, Charles Hilton, inspected the work site, including the roof.  Deposition of Charles Hilton, July 17, 2009, at 10 (Exhibit 8 to Defendant's Motion and Exhibit I to Plaintiff's Memo).

At approximately 4:55 p.m., a large portion of the mine roof collapsed onto Reynolds and Hilton, who was kneeling beside Reynolds.  WVOMHST Report at 4.  Once Hilton was able to free himself from the fallen roof, he ran to the mine phone and called for help.  Id.  Reynolds was transported to Williamson Memorial Hospital where he was pronounced dead at 6:18 p.m.  Id.

Both the federal Mine Safety and Health Administration ("MHSA") and the West Virginia Office of Miners' Health Safety and Training ("WVOMHST") investigated the accident.  The section of roof that fell was approximately 45 feet long, 18 feet wide, and 5

3

feet thick.  WVOMHST Report at 5.  According to the WVOMHST
Report:

> The roof fall material consisted of layers of shale and
> siltstone with intersecting slickensided formations.
> Slickensided formations are polished rock masses within
> the mine roof which are prone to falling if they are not
> provided with adequate supplemental support. . .  The
> part of the fall cavity that occurred in the
> intersection was localized along a horseback, a
> hazardous mass of rock with a slippery surface in the
> roof.

Id.  The MSHA issued a citation to Consol which concluded that
"[t]he mine operator did not follow the approved roof control plan
approved by the District Manager, that is suitable to the
prevailing geological conditions, and the mining system to be used
at the mine.  Adverse roof conditions were encountered and
appropriate supplemental roof support was not installed."  Mine
Citation/Order No. 7259309 (Exhibit 14 to Defendant's Motion).[1]

   Every Consol employee who examined the roof in the area where
the accident occurred concluded that the roof was safe and secure
on September 3, 2007.  Deposition of Bill Bentley, October 21,

---

[1] The No. 4 panel existed at least seven months prior to the
accident on September 3, 2007.  Deposition of Thomas Charles,
November 5, 2009, at 51 (Exhibit A to Defendant's Reply Brief).
During that time, both the federal Mine Safety and Health
Administration ("MHSA") and the West Virginia Office of Miners'
Health Safety and Training ("WVOMHST") examined and inspected the
area quarterly.  Id. at 52, 55, and 106.  Adequacy of the roof
and roof control measures were a part of this inspection process
and Consol was never issued a citation because of roof problems
in the No. 4 panel prior to the accident.  Id.

2009, at 7-11 (Exhibit C to Defendant's Reply Brief).   Plaintiff's

liability expert conceded this point:

Q:   What's the most effective way to test the roof or
     the top?

A:   The most effective way, good daily visual
     examinations and tests.

Q:   Has anyone testified in this case that they failed
     to make a visual examination of the top on
     September 3, 2007?

A:   Not that they failed, no.

Q:   Has anyone said that they examined the top on
     September 3, 2007 and they thought there was some
     problems?

A:   Not that I'm aware of.

Q:   Were there any witnesses that said they actually
     examined the top on September 3, 2007 and it
     appeared to be good, solid top?

A:   In a round about way, yes.

Charles Depo. at 91.

Every Consol employee who saw the fall agreed that they had

never seen anything like it and that there was no way to predict

that it would happen.   Kevin Williams testified:

Q:   What's your understanding of why the roof came in
     on top of Brent?

A:   I hadn't never seen nothing like that before, to be
     honest with you.

Q:   What do you mean?

A:   I mean, I've worked in the mines a long time.   I
     just hadn't never seen nothing like that.

Q:   What did you see that you hadn't ever seen before?

5

> A:     Just the way it fell out.  I mean, it had to be
>        just a big horse's back.  I mean, I don't know how
>        you could have - - I don't know if there was any
>        way you could have spotted it or anything else to
>        even do anything about it, if you could have done
>        anything about it.

Williams Depo. at 30.  Scarberry, the mine foreman stated "I've
never seen nothing like it, and I've been at it 37 years.  37
years, 4 states and 100 mines."  Scarberry Depo. at 31; see also
Hilton Depo. at 37-38 ("Well, when I went in and looked at it, you
know, I seen that it was a change in strata, but it was a big
horse's back, you know.  Bigger than we've ever seen. . . . Well,
it was like a shale slate or sand in that area.  It did not
depict.  But when it fell it showed that there was sand just not
very far above it.  It was very unique.  I've never seen nothing
like it.); Holbrook Depo. at 49 ("I've never seen anything like it
before.").  When asked for his understanding of why the roof came
down, Ron Yates, a section foreman, testified "Well, I've never
seen anything like it.  I can say that.") Yates Depo. at 35.
Indeed, plaintiff's own brother, Brian Reynolds, a coal miner of
19 years who was working at the Bronzite Mine on the day his
brother died, inspected the No. 4 panel after the accident and
stated: "the horses back, the way they fall out, I mean, to where
it jerked out bolts you couldn't - - you wouldn't have known it
was there till it fell."  Deposition of Brian Reynolds, December
9, 2009, at 34 (Exhibit A to Defendant's Supplemental Memorandum).

On or about October 4, 2007, Cyrena Kay Reynolds, the wife of Brent Reynolds, was appointed administratrix of her husband's estate.  Thereafter, on June 11, 2008, Cyrena Reynolds filed the deliberate intent lawsuit in the Circuit Court of Mingo County, West Virginia against defendant Consol.  On June 25, 2008, Consol removed the case to this court on the basis of diversity of citizenship.  The instant motion for summary judgment followed. Consol contends that plaintiff cannot satisfy the elements to maintain a deliberate intent lawsuit.

### Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The moving party has the burden of establishing that there is no genuine issue as to any material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  This burden can be met by showing that the nonmoving party has failed to prove an essential element of the nonmoving party's case for which the nonmoving party will bear the burden of proof at trial.  Id. at 322.  If the moving party meets this burden, according to the United States Supreme Court, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element

7

of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

Once the moving party has met this burden, the burden shifts to the nonmoving party to produce sufficient evidence for a jury to return a verdict for that party.

> The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.  The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find, by a preponderance of the evidence, that the plaintiff is entitled to a verdict . . . .

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Id. at 250-51.

## Analysis

The West Virginia Workers' Compensation system "is intended to remove from the common law tort system all disputes between or among employers and employees regarding the compensation to be received for injury or death to an employee."  W. Va. Code § 23-4-2(d)(1).  The employer's immunity from tort liability "may be lost only if the employer or person against whom liability is asserted acted with 'deliberate intention.'"  W. Va. Code § 23-4-2(d)(2).  Under the deliberate intention exception, an employee can recover excess damages over the amount

8

received under the workers' compensation scheme.  <u>Mayles v.
Shoney's, Inc.</u>, 405 S.E.2d 15, 18 (W. Va. 1990).

To prove deliberate intent, a plaintiff must satisfy all
of the following five elements:[2]

> (A) That a specific unsafe working condition
> existed in the workplace which presented a high
> degree of risk and a strong probability of
> serious injury or death;
>
> (B) That the employer, prior to the injury, had
> actual knowledge of the existence of the specific
> unsafe working condition and of the high degree
> of risk and the strong probability of serious
> injury or death presented by the specific unsafe
> working condition;
>
> (C)  That the specific unsafe working condition
> was a violation of a state or federal safety
> statute, rule or regulation, whether cited or
> not, or of a commonly accepted and well-known
> safety standard within the industry or business
> of the employer, as demonstrated by competent
> evidence of written standards or guidelines which
> reflect a consensus safety standard in the
> industry or business, which statute, rule,
> regulation or standard was specifically
> applicable to the particular work and working
> condition involved, as contrasted with a statute,
> rule, regulation or standard generally requiring
> safe workplaces, equipment or working conditions;
>
> (D) That notwithstanding the existence of the
> facts set forth in subparagraphs (A) through (C),
> inclusive, of this paragraph, the employer
> nevertheless intentionally thereafter exposed an

---

[2]  Alternatively, deliberate intention is satisfied if "[i]t
is proved that the employer or person against whom liability is
asserted acted with a consciously, subjectively and deliberately
formed intention to produce the specific result of injury or
death to an employee."  W. Va. Code § 23-4-2(d)(2)(i).  However,
plaintiff does not allege any set of facts that would satisfy
this exception.

> employee to the specific unsafe working
> conditions; and
>
> (E) That the employee exposed suffered serious
> compensable injury or compensable death . . .
> whether a claim for benefits under this chapter
> is filed or not as a direct and proximate result
> of the specific unsafe working condition.

W. Va. Code § 23-4-2(d)(2)(ii)(A)-(E).  The deliberate intent

statute requires a court to grant summary judgment if:

> consistent with the legislative findings of
> intent to promote prompt judicial resolution of
> issues of immunity from litigation under this
> chapter, the court shall dismiss the action upon
> motion for summary judgment if it finds, pursuant
> to rule 56 of the Rules of Civil Procedure that
> one or more of the facts required to be proved by
> the provisions of subparagraphs (A) through (E),
> inclusive, paragraph (ii) of this subdivision do
> not exist. . . .

W. Va. Code § 23-4-2(d)(2)(iii)(B).

In its motion for summary judgment, defendant attacked

plaintiff's ability to prove deliberate intent on several fronts.

This court, however, limits its discussion to the first and

second elements: 1) whether plaintiff has shown that a specific

unsafe working condition existed in the workplace which presented

a high degree of risk and a strong probability of serious injury

or death; and 2) whether Consol knew that the specific unsafe

working condition presented a high degree of risk and the

probability of serious injury or death.

In the present case, plaintiff alleges that the specific

unsafe working condition in question was "a transition zone in

the mine roof that was not properly evaluated or supported." Plaintiff's Memorandum at 6.  According to plaintiff, "coal rider seams are typically found in transition zones. . . . They're considered adverse roof conditions, in and of themselves, because they result in roof separation and falls and because roof bolts cannot anchor into them." <u>Id.</u> at 7.  However, plaintiff's assertion to the contrary, the record does not establish that a transition zone presents a high degree of risk or a strong probability of serious injury or death.  Plaintiff's expert stated that while some transition zones could cause adverse roof conditions, others did not.[3]  Charles Depo. at 171-72.  According to Mr. Charles, the best way to determine if you had an adverse transition zone was to drill a test hole and watch for "raveling and peeling." <u>Id.</u> at 172.  It is undisputed that Consol both drilled test holes at the No. 4 panel and visually inspected of the roof.

---

[3]  The testimony of Consol employees was largely in line with Mr. Charles on this point.  <u>See, e.g.</u>, Holbrook Depo. at 28 ("Q:  When you have a change of strata in the mine roof, is that an adverse roof condition?  A: It can be."); Yates Depo. at 47-48 ("Q: [When] you see a roof go from shale to sandstone or sandstone to shale, could that indicate an adverse roof condition?  A: It's according, I guess.  If the transaction [sic] was gradual, most of the time there's not any trouble with it."); Deposition of Tracy Dingess, June 10, 2009, at 22 (Exhibit 7 to Defendant's Motion and Exhibit F to Plaintiff's Memo) ("Q: If I've got a roof that goes from sandstone to shale, where they meet or run into each other, would that be considered a transition area?  A: Uh-huh.  Q: Is that generally considered an ad[verse condition?].  A: Yes.  It can be, yes.").

The evidence likewise shows that rider seams, in and of themselves, do not always constitute adverse roof conditions. Mr. Charles testified that rider seams are found in approximately 50 percent of all mines.  Id. at 101.  Bill Bentley, a Consol construction foreman, stated that rider seams are not an indicator of adverse roof conditions because "[a]ll mines have them."  Bentley Depo. at 11.  The testimony was that, under certain circumstances, a coal rider seam could be adverse, not that they always were.  Williams Depo. at 24-25 (depends on height of rider seam); Hilton Depo. at 25 (coal rider seam overlaying mine roof is adverse condition); Dingess Depo. at 22 (coal rider seam overlaying mine roof is adverse condition); Scarberry Depo. at 34 ("A rider seam at a certain point is adverse.").[4]

Consol's roof control plan lists a number of adverse roof conditions[5] that, when detected, require supplemental roof support.  Roof Control Plan dated July 2, 2006 at p.5 (Exhibit B to Defendant's Reply Memo).  It makes no mention of either

---

[4] Tracy Dingess testified that "a coal rider overlaying the mine roof" would be considered an adverse condition.  Dingess Depo. at 22.  He also testified that there were times that a test hole did not reveal the existence of a coal rider seam.  Id. at 15.

[5] Horsebacks, slicken sided slope formations, clay veins, kettle bottoms, surface cracks, mud streaks are listed as adverse roof conditions.  Roof Control Plan dated July 2, 2006 at p.5 (Exhibit B to Defendant's Reply Memo).

12

transition zones or rider seams being adverse roof conditions.
Id.

Finally, to the extent that plaintiff relies on the
testimony of Kevin Williams to establish the existence of a rider
seam, it is clear from Williams testimony that he did not believe
this particular rider seam was adverse.  Williams performed
rehabilitation work on the No. 4 panel.  Williams Depo. at 9-12.
In its report, the MSHA stated that Williams informed it that he
had encountered a rider seam during roof bolting on the No. 4.
MSHA Report at 6.  According to Williams, the MSHA "never did ask
me where I hit a rider seam at.  What rider seam I hit was at
two, one and a half. " Id. at 14.  Williams testified that "if
I've got a rider seam that's a foot and a half, two, two and a
half foot, I'm putting up a four-foot bolt and it's anchoring in
solid top, I mean, it actually ain't adverse top."  Id. at 20.
Williams' own testimony confirms that Consol believed the
measures it took to secure the roof, rider seam and all, were
sufficient.  For all these reasons, the court finds that
plaintiff has not established the existence of a specific unsafe
working condition which presented a high degree of risk and a
strong probability of serious injury or death.

As to the necessity of proving actual knowledge:

> [A] plaintiff attempting to impose liability on the
> employer must present sufficient evidence, *especially*
> with regard to the requirement that employer had a
> subjective realization and an appreciation of the

13

> existence of such specific unsafe working condition *and*
> the strong probability of serious injury or death
> presented by such specific unsafe working condition.
> This requirement is not satisfied merely by evidence
> that the employer reasonably should have known of the
> specific unsafe working condition and of the strong
> probability of serious injury or death presented by
> that condition.  Instead, it must be shown that the
> employer *actually possessed such knowledge*.

Gaus v. Consol, Inc., 294 F.Supp. 2d 815, 821 (N.D.W. Va. 2002)

(emphasis in original) (quoting Blevins v. Beckley Magnetite,

Inc., 408 S.E.2d 385, 393 (W.Va. 1993)).  "The standard . . . to

satisfy [this section] is `actual' knowledge.  This is a high

threshold that cannot be successfully met by speculation or

conjecture."  Mumaw v. U.S. Silica Co., 511 S.E.2d 117, 123 (W.

Va. 1998).

     In the present case, plaintiff alleges that the specific

unsafe working condition in question was a coal rider seam in a

transition zone.  Assuming for the sake of argument this

constitutes an unsafe working condition, plaintiff offers no

evidence showing that defendant subjectively realized that the

transition zone or coal rider seam at issue presented a high

probability of serious injury or death to plaintiff.

     In Mayles v. Shoney's, Inc., the court held that an

employer who knew his employees regularly carried hot grease down

a steep hill had a subjective realization of the high probability

of serious injury or death presented by such an unsafe activity.

405 S.E.2d at 16.  In Mayles, the evidence clearly established

14

that the employer knew its employees regularly disposed of hot grease in an unsafe manner, that the employer failed to take any corrective action, and that the employer's "do everything right now" policy led to these unsafe practices.  Id. at 21.  Further, the employees in Mayles had previously complained to management about this unsafe practice and at least one other employee had been injured in a similar manner.  Id.

The record is completely devoid of evidence that Consol knew that the roof in the No. 4 panel presented a strong probability of serious injury or death.  Indeed, the evidence is just the opposite.  Shawn Johnson, the continuous miner operator who Brent Reynolds relieved, stated that when he was working on the No. 4 entry he "didn't see [him]self in any immediate danger. If I would have I wouldn't have been there."  Johnson Depo. at 13 ("Now, if I would have thought we had a condition, a dangerous condition, you know, I would have looked for more support or anything, but I didn't feel that we were in any immediate danger there.").  Richard Wiley, a roof bolter working in the area stated that the roof there "was pretty good.  Actually, that section right there was a pretty good section."  Deposition of Richard Wiley, July 17, 2009, at 10 (Exhibit 6 to Defendant's Motion; Exhibit N to Plaintiff's Memo.).  Ron Yates, Reynold's co-worker agreed: "Everything looked all right.  Everything looked good.  I didn't see anything out of the ordinary.  No

reason why we couldn't start mining coal." Yates Depo. at 10.

Because plaintiff cannot show that Consol had <u>actual knowledge</u>

that the transition zone at issue presented a high probability of

death or injury to Brent Reynolds, her deliberate intent claim

must fail.

To the extent that plaintiff relies on the decision in

<u>Ryan v. Clonch Indus., Inc.</u>, 639 S.E.2d 756 (W. Va. 2006), in

arguing that Consol is barred from denying it possessed actual

knowledge of the alleged specific unsafe working condition, that

argument is without merit.  In <u>Ryan</u>, the employer admitted that

it had failed to conduct a mandatory hazard inspection which

would have revealed the unsafe working condition resulting in

injury.  <u>Id.</u> at 762-66.  The <u>Ryan</u> court refused to allow the

employer to deny actual knowledge holding that

> where the defendant employer has failed to
> perform a reasonable evaluation to identify
> hazards in the workplace in violation of a
> statute, rule or regulation imposing a mandatory
> duty to perform the same, the performance of
> which may have readily identified certain
> workplace hazards, the defendant employer is
> prohibited from denying that it possessed "a
> subjective realization" of the hazard asserted in
> the deliberate intent action, and the employee,
> upon demonstrating such violation, is deemed to
> have satisfied his or her burden of proof with
> respect to showing "subjective realization"
> pursuant to W. Va. Code § 23-4-2(c)(2(ii)(B).

<u>Id.</u> at 766.  This case is distinguishable from <u>Ryan</u> as there is

no evidence Consol failed to carry out its inspection duties.

## Conclusion

Based on the foregoing, defendant's motion for summary judgment is GRANTED.  Accordingly, a separate Judgment Order of even date herewith will be entered.

The Clerk is directed to send copies of this Memorandum Opinion to all counsel of record.

It is SO ORDERED this 8th day of September, 2010.

ENTER:

David A. Faber
Senior United States District Judge

17